ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **EDWIN CUADRADO PADILLA**<br><br>Apelante<br><br>v.<br><br>**MARIA YOLANDA IRIZARRY SANTOS**<br><br>Apelada | KLAN202300436 | **APELACION** procedente del Tribunal de Primera Instancia, Sala Superior de **Fajardo**<br><br>Civil Núm.:<br>**NSCI201500442**<br><br>Sobre:<br>Liquidación Comunidad |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y la Jueza Rivera Pérez.

Cintrón Cintrón, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de diciembre de 2023.

Comparece ante nos el señor Edwin Cuadrado Padilla (señor Cuadrado Padilla o apelante) y solicita la revisión de la *Sentencia* dictada el 17 de marzo de 2023, por el Tribunal de Primera Instancia, Sala Superior de Fajardo (TPI). Mediante la misma, el TPI dispuso que el señor Cuadrado Padilla retendría la titularidad de un inmueble y deberá pagar a la señora María Yolanda Irizarry Santos (señora Irizarry Santos o apelada) la suma de $33,218.75 por el valor de su participación en la comunidad de bienes, más interés al tipo legal del 8% anual, acumulados desde el 1 de febrero de 2018, hasta satisfacer la *Sentencia.* Lo anterior, dentro de un pleito sobre división de bienes gananciales.

I

Según surge del expediente, el señor Cuadrado Padilla y la señora Irizarry Santos estuvieron casados bajo el régimen de sociedad legal de bienes gananciales desde el 23 de diciembre de 1989 hasta el 13 de febrero de 2012, cuando el Tribunal de Primera

Instancia emitió la sentencia de divorcio. Mientras estuvieron casados, el señor Cuadrado Padilla y la señora Irizarry Santos acumularon bienes de naturaleza ganancial y obligaciones con terceros.

El matrimonio Cuadrado Irizarry vivió en un inmueble ubicado en la carretera PR-985, kilómetro 1.6 del Barrio Quebrada, en el municipio de Fajardo. Dicha propiedad pertenecía al señor Juan Fernández Torres y su esposa, la señora Inés Padilla Rivera, quienes criaron al señor Cuadrado Padilla desde que su madre falleció y este tenía nueve (9) meses de nacido. El señor Cuadrado Padilla se refería al señor Fernández Torres y a la señora Padilla Rivera como sus abuelos. Estos últimos testaron el tercio de libre disposición a favor de Cuadrado Padilla.

El 18 de junio de 2015, el señor Cuadrado Padilla presentó demanda sobre división de bienes gananciales contra la señora Irizarry Santos. Alegó que adquirió su participación hereditaria mediante la escritura pública número (1) sobre partición y adjudicación de bienes hereditarios, de la cual surgía que la señora Irizarry Santos compareció a los únicos efectos de reconocer el carácter privativo de los bienes inmuebles heredados por su esposo. Añadió que deseaba liquidar el aumento o merma en valor, si alguno, que sufriera la propiedad desde el 27 de febrero de 1997 hasta la fecha de presentada la demanda. Esbozó que era necesario liquidar la comunidad de bienes para finiquitar el único asunto pendiente entre las partes.

La señora Irizarry Santos contestó oportunamente la demanda. Adujo, entre otras cosas, que los bienes de sus respectivas herencias fueron invertidos para beneficio de la Sociedad Legal de Bienes Gananciales que existía entre ambos, con los cuales se reparó y mejoró un inmueble donde residieron. Además, arguyó que las partes incurrieron en un préstamo para

adquirir parte de la participación de la herencia que le correspondía al señor Cuadrado Padilla, por lo que dicha inversión era ganancial. Argumentó que las mejoras realizadas al inmueble donde vivieron se hicieron con bienes de la Sociedad Legal de Bienes Gananciales. Aseveró que su exesposo se negaba a cumplir con su obligación de compensarla con cualquier participación que pudiera tener en los bienes adquiridos durante su matrimonio.

Tras varios trámites procesales, el juicio en su fondo se celebró los días 11, 12, 13 de enero y el 21 de febrero de 2023. Se recibieron testimonios del señor Cuadrado Padilla, la señora Irizarry Santos, el señor Robert Hoffman Carmona y el estimador de costos de construcción, el señor José L. Cintrón. Asimismo, se admitió la siguiente prueba documental:

**Exhibits Conjuntos**:
A. Informe de Tasación del Inmueble ubicado en PR-985, Kilómetro 1.6, Barrio Quebrada, Fajardo PR 00738, al 11 de diciembre de 2019.

B. Sentencia de Divorcio Caso NSRF201100793 dada el 13 de febrero de 2012.

C. Cheques por la suma de $ 85,717.02 fechados 17 de junio de 1997: $30,000.00 a la orden de Vicente Fernández, $44,344.02 a la orden de Cuadrado e Irizarry, $4,331.00 a la orden de Island Finance, $1,727.00 a la orden de Mueblerías Berrios, $1,741.00 a la orden de First Bank, $3,574.00 a la orden de Comoloco.

**Exhibits por parte del señor Cuadrado Padilla:**

1. Escritura #1 de Partición y Adjudicación de Bienes Hereditarios otorgada el 25 de febrero de 1997 ante el Notario Francisco José Ramos González, con Escritura #12 de Rectificación otorgada el 26 de septiembre de 2011 ante la Notario Claribel Toro Hernández.

   1A. Escritura # 48 de Testamento Abierto de Juan Fernández Torres otorgada el 26 de septiembre de 1983 ante el Notario Julio de Santiago Díaz.

   1B. Escritura #49 de Testamento Abierto de Inés Padilla Rivera otorgada el 26 de septiembre de 1983 ante el Notario Julio de Santiago Díaz.

   1C. Certificado de Cancelación de Gravamen Contributivo para el causante Juan Fernández Torres.

2. Moción Informativa en el caso NQ02015-206.

    2A. Orden de recoger pertenencias

    2B. Desglose de bienes muebles

    2C. Orden de Citación

    2D. Querella Ley 140

    3A. Fotografías del Inmueble

    3B. Fotografías del Inmueble

    3C. Fotografías del Inmueble

    3D. Fotografías del Inmueble

4. Carta del 13 de junio de 1997.

El señor Cuadrado Padilla Demandante ofreció en evidencia, pero no fue admitido, un informe de estimado de costos de construcción.

### Exhibits por parte de la señora Irizarry Santos:
1. Documentos de Préstamo del 13 de junio de 1997.
2. Cheque #13582.
3. Pliego de Interrogatorios y Contestaciones con el limitado alcance que se admiten solamente las preguntas y contestaciones con las cuales se confrontó al señor Cuadrado Padilla durante su contrainterrogatorio.

El TPI hizo las siguientes determinaciones de hechos:
...
5. Mediante Escritura #1 de Partición y Adjudicación de Bienes Hereditarios otorgada el 25 de febrero de 1997 ante el Notario Francisco José Ramos González, Cuadrado adquirió el Inmueble como sigue: Cuadrado adquirió un interés del 45.83% mediante herencia y el 16.67% mediante donación, y el restante 37.5% mediante compra al Señor Vicente Fernández Padilla de su participación en el inmueble utilizando dineros gananciales del matrimonio Cuadrado-Irizarry. Exhibit 1 del Demandante. O sea, la propiedad es privativa de Cuadrado en un 62.5% y posganancial en un 37.5%.[1]

---

[1] El TPI explicó que llegó a esta conclusión a base de su lectura de la Escritura de Partición y Adjudicación de Bienes Hereditarios. Esta identifica a los señores Cuadrado-Irizarry como los comparecientes de la Segunda Parte, pero indica que la señora Irizarry Santos comparece a los únicos efectos de reconocer "el carácter privativo de los bienes inmuebles heredados por su esposo que son objeto de esta escritura".

Las partes le atribuyeron al Inmueble un valor de $80,000 para propósitos de la partición de herencia. Exhibits 1 y 1C del Demandante.

El párrafo Décimo de la escritura, indica que Don Vicente Fernández Padilla le vende a Cuadrado su participación en el Inmueble por la suma de $30,000. Sin embargo, no se presentó evidencia de que Cuadrado haya adquirido esa participación con dineros privativos. Por el contrario, la evidencia demuestra que el pago se hizo con dineros gananciales obtenidos a través de un préstamo ganancial. Exhibit 1 de la Demandada y Exhibit Conjunto C.

"La restante participación del compareciente de la primera parte, o sea la suma de $13,333.00, mediante este acto el compareciente de la primera parte dona al

6. Los Abuelos habían construido en el Inmueble una casa de dos plantas y 1,350 pies cuadrados de construcción, con sala, comedor, cocina, un baño, dos closets y dos dormitorios en el primer piso, y sala, un baño, y tres dormitorios, en el segundo piso. Exhibit 1 de Demandante.

7. El 13 de junio de 1997, Cuadrado e Irizarry tomaron un préstamo de $63,390. Estipulación del 17 de febrero de 2023 y Exhibit 1 de la Demandada. De cuya suma pagaron $30,000 a Vicente Fernández para comprar su participación en el Inmueble, y utilizaron el balance (luego de los gastos de cierre) para saldar un préstamo ganancial de Island Finance, deudas gananciales con Mueblerías Berrios, First Bank y Comoloco. Exhibit Conjunto C y Estipulación del 17 de febrero de 2023.

8. Durante el matrimonio de Cuadrado e Irizarry se hicieron mejoras al Inmueble. Testimonios de Cuadrado e Irizarry.

9. La casa ahora cuenta con 1,920 pies cuadrados de construcción. Exhibit Conjunto A. O sea, 570 pies cuadrados más que cuando la adquirieron, equivalente al 30% del área de construcción de la casa, incluyendo un salón de belleza con baño que construyeron y equiparon durante el 2001. Exhibit Conjunto A y Testimonio de Irizarry.

10. Se construyó una verja con portones eléctricos par [sic] el frente de a [sic] casa, y verjas de cemento y *cyclone fence* en los costados. Construyeron también cuatro estructuras independientes en el terreno: un establo (325 pies cuadrados), jaula de gallos (800 pies cuadrados), y dos áreas de almacenamiento con baño. Exhibit Conjunto A, *Estipulaciones Sobre Hechos y Documentos* (11/3/2019) y Testimonios de Cuadrado e Irizarry.

11. Las mejoras se hicieron con fondos gananciales, materiales que aportaba el patrono de Cuadrado y con el esfuerzo de Cuadrado o amistades que él reclutaba para ayudarle. Testimonios de Cuadrado e Irizarry.

12. Las partes compraron con dinero ganancial e instalaron en el Inmueble: cuatro ventanas de seguridad y gabinetes de cocina. *Estipulaciones Sobre Hechos y Documentos* (11/3/2019).

13. Las partes estipularon un valor de mercado de $118,000 para el Inmueble para propósitos de liquidación de la comunidad posganancial. Exhibit Conjunto A.

14. El tasador estipulado adjudicó un valor de $30,000 al terreno del Inmueble, $13,000 a la verja y

---

compareciente de la segunda parte y este a su vez acepta." No se presentó evidencia de planilla de donación. Entendemos, por la manera en que está redactada la Escritura 1, que la intención de Don Vicente Fernández Padilla fue donar ese valor a su primo y hermano de crianza Cuadrado."

edificaciones accesorias (véanse los ajustes a las comparables), y el balance de $75,000 a la Casa. Exhibit Conjunto A.

15. Durante el matrimonio, Irizarry recibió una herencia con la cual, entre otras, cosas, ayudó económicamente a la unidad familiar y compró un automóvil para sí. *Estipulaciones Sobre Hechos y Documentos* (11/3/2019).

16. Luego del Divorcio, Irizarry continuó ocupando el Inmueble hasta que se mudó en marzo de 2014 y retuvo un automóvil Isuzu Ascender del 2004. Testimonio de Irizarry y *Estipulaciones Sobre Hechos y Documentos* (11/3/2019). A la fecha del divorcio en 2013, el automóvil tenía nueve años, y no se ofreció evidencia de su valor a esa fecha o a esta.

17. Cuando desalojó el Inmueble, Irizarry se llevó el automóvil, muebles de sala y comedor, lavadora y secadora, nevera, algunos objetos de la vajilla, ollas y platos, y algunas piezas de ropa. Testimonio de Irizarry y *Estipulaciones Sobre Hechos y Documentos* (11/3/2019). No se ofreció evidencia competente del valor del carro ni de los muebles y enseres.

18. No le avisó a Cuadrado cuando desalojó la propiedad ni le devolvió las llaves. Testimonios de Cuadrado e Irizarry.

19. Durante 2013 y parte del 2014, pesaba una Orden de Protección contra Cuadrado. Testimonio de Cuadrado.

20. Cuadrado tomó posesión del Inmueble en o alrededor de agosto de 2015, encontró que faltaban gran parte del mobiliario y equipo, y procedió a cambiar los candados. Testimonios de Cuadrado y Hoffman. Cuando Cuadrado tomó posesión del Inmueble, aún estaba allí la estufa, y un chinero, cuyo valor no se estipuló ni evidenció. Exhibit 3(a) del Demandante.

21. No fue hasta el 3 de enero de 2018 que Irizarry solicitó que se le compensara su parte proporcional de la renta. Véase, Moción Reclamando Créditos Por Concepto de Rentas.

22. En agosto de 2015, Irizarry retiró propiedad adicional del Inmueble, bajo una orden del de [sic] recoger pertenencias personales. Llevándose efectos personales y una secadora de cabello del salón de belleza. Exhibit 2A del Demandante, Testimonio de Irizarry, y *Estipulaciones Sobre Hechos y Documentos* (11/3/2019). Estos tampoco fueron valorados.

Así las cosas, el 17 de marzo de 2023, el foro *a quo* dictó la Sentencia que hoy revisamos. Mediante la misma, dispuso lo siguiente:

En virtud de lo anterior, se dicta Sentencia para la liquidación de la comunidad posganancial, disponiendo que Cuadrado deberá retener la titularidad del inmueble y deberá pagar a Irizarry la suma de $33,218.75 por el valor de su participación en la comunidad, más intereses al tipo legal del 8% anual, según fijado por la Oficina del Comisionado de Instituciones Financieras, acumulados desde el 1 de febrero de 2018 y hasta que [SIC] se satisfecha la Sentencia. Regla 44.1 de Procedimiento Civil. No se [sic] proceden las costas ni honorarios de abogados.

El TPI determinó que la comunidad posganancial participó en la plusvalía de su crédito o inversión en el inmueble que fue adquirido por el señor Cuadrado Padilla en un 62.5% con la herencia que le dejaron los abuelos y la donación que le hiciera el señor Fernández Padilla, y en un 37.5% con dinero de la Sociedad Legal de Gananciales. Además, el tribunal de instancia concluyó que, durante el matrimonio, el señor Cuadrado Padilla y la señora Irizarry Santos hicieron mejoras al mencionado inmueble que incidieron sobre su valor. Así, expresó que la comunidad posganancial participó en el valor que dichas mejoras aportaron al inmueble concernido. En consecuencia, el tribunal determinó que el crédito de la señora Irizarry Santos ascendió a $33,218.75 es decir, la mitad de la inversión posganancial con su plusvalía.

En consonancia con lo anterior, el TPI expresó que las partes del caso testificaron que el matrimonio construyó un salón de belleza en la parte inferior de la casa. Añadió que dicha área de construcción añadida al inmueble incidió en su valor según la tasación. Además, el foro primario particularizó que no se ofreció evidencia competente de los equipos y mobiliarios del salón de belleza que, a la fecha el divorcio, habían depreciado 12 años.

Asimismo, el TPI dispuso que:

Irizarry admite que se llevó los muebles de sala, comedor, lavadora y secadora que pertenecían a la sociedad de gananciales. Sin embargo, Cuadrado retuvo la estufa y un chinero cuyo valor no surge del expediente. Por lo cual se nos hace imposible concluir si alguno de los cónyuges retuvo un valor mayor de los bienes muebles. En cuanto a los equipos que Irizarry

alega haber dejado en la propiedad y que Cuadrado alega habían desparecido cuando él tomó posesión, no se ha presentado evidencia que nos permita atribuir la desaparición de estos a alguna de las partes.

Irizarry testificó que utilizó dinero privativo de una herencia para hacer mejoras a la propiedad. Sin embargo, los elementos que describió (gabinetes de cocina, abanicos de techo, tablillas y puertas de armario) no constituyen mejoras capitales sino equipos y mobiliarios cuyo reemplazo forma parte del mantenimiento de una casa. Aun cuando ese equipo o mobiliario fuera privativo de ella y permaneciera en parte en el Inmueble, no se nos ha traído evidencia del valor de estos. Irizarry también testificó que compró con dinero privativo las losas con las cuales se enchapó el baño de la primera planta, pero no aportó evidencia que nos permita cuantificar cómo esas losas inciden sobre el valor del Inmueble.

Tampoco se ofreció evidencia del valor de renta del Inmueble. Sin embargo, los intereses sobre el valor de la participación de Irizarry en el Inmueble representan el valor de explotación o uso de ese capital. Por lo cual procede adjudicárselos a partir de que ella reclamó el pago de rentas. En cuanto a cualquier otro periodo en que Cuadrado o Irizarry hayan gozado del uso exclusivo del Inmueble, aplica la presunción que el comunero consintió tácitamente a que el otro comunero ocupara el bien común.

En desacuerdo con la antedicha decisión, el 4 de abril de 2023, el señor Cuadrado Padilla instó una moción de reconsideración. Analizado el escrito, el 11 de abril de 2023, el TPI emitió una Resolución en la cual declaró *Sin Lugar* la solicitud de reconsideración.

Aún inconforme, el señor Cuadrado Padilla acude ante este Tribunal de Apelaciones. Mediante su recurso, alega que el foro primario cometió los siguientes errores:

Erró el Honorable TPI al dictar sentencia imponiendo intereses a partir del 1 de febrero de 2018 contrario a lo dispuesto en la Regla 44.1 de Procedimiento Civil de Puerto Rico.

Erró el Honorable TPI en su apreciación de la prueba al dictar sentencia en contrario a lo que demuestra la prueba documental y testifical en cuanto a que la propiedad inmueble es un bien privativo aportado al matrimonio por el apelante y no le pertenece a la sociedad de gananciales en un 37.5 por ciento por lo que el Tribunal estaría impedido de distribuir la plusvalía del bien inmueble sin tener conocimiento del valor en el mercado de dicho bien cuando fue adquirido

el 25 de febrero de 1997 y utilizando valores arancelarios de la escritura y equiparar los mismos con el valor en el mercado de la propiedad y máxime porque no procede en derecho.

Erró el Honorable TPI al descartar el testimonio del perito para asignar un porciento hipotético para otorgar un valor monetario del bien inmueble privativo y dejar de atribuir los créditos correspondientes a la parte demandada de epígrafe.

El 10 de octubre de 2023, el apelante presentó su alegato suplementario. La apelada presentó su alegato en oposición el 7 de noviembre de 2023. Con el beneficio de la comparecencia de todas las partes, procedemos a resolver.

II

A.

Es sabido que, tanto las determinaciones de hechos, como la apreciación de la prueba, la adjudicación de credibilidad y el valor probatorio que le otorga el Tribunal de Primera Instancia a la evidencia presentada, son merecedoras de gran deferencia. *SLG Torres-Matundan v. Centro Patología,* 193 DPR 920, 933 (2015). Su razón de ser estriba en que es el foro sentenciador el que ha tenido el beneficio de escuchar y observar el *demeanor* de los testigos. *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). En nuestro ordenamiento jurídico, "ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia". *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 219 (2021). No obstante, dicho principio no es uno absoluto.

Recientemente, nuestro más Alto Foro reiteró que el juzgador incurre en pasión, prejuicio o parcialidad cuando actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que

no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que someta prueba alguna. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022), citando *Dávila Nieves v. Meléndez Marín*, supra, a la pág. 782.

Por otra parte, el Tribunal Supremo de Puerto Rico destacó que el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. *Íd*. Por consiguiente, se ha establecido que cuando los foros apelativos percibimos la existencia de pasión, prejuicio, parcialidad o error manifiesto no estamos compelidos a abstenernos, por lo que bajo estas instancias poseemos autoridad para intervenir. *SLG Torres-Matundan v. Centro Patología*, supra; *Dávila Nieves v. Meléndez Marín*, supra, a las págs. 770-771; *González Hernández v. González Hernández*, 181 DPR 746, 776-777 (2011); *Muñiz Noriega v. Muñoz Bonet*, 177 DPR 967, 986-987 (2010); *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 810-811 (2009); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007).

Del mismo modo, este foro apelativo se encuentra en igual condición que el TPI para evaluar la evidencia documental y pericial. *González Hernández v. González Hernández*, supra, a la pág. 777. Es decir, estamos autorizados a adoptar nuestro propio criterio al momento de evaluarla. En *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 297 (2006), el Tribunal Supremo de Puerto Rico expresó que los tribunales apelativos "[t]enemos plena libertad de adoptar nuestro propio criterio en la apreciación de la prueba pericial. Incluso, podemos descartarla, aunque resulte técnicamente correcta". Por consiguiente, los foros revisores poseen la facultad de examinar y evaluar la prueba pericial según estimen prudente. *Cruz*

*Flores et. al. v. Hosp. Ryder et al.*, 210 DPR 465, 495 (2022); *González Hernández v. González Hernández*, supra.

B.

La Regla 44.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.3, versa sobre la fijación del interés legal postsentencia y por temeridad. Esta dispone lo siguiente:

(a) Se incluirán intereses al tipo que fije por reglamento la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras, y que esté en vigor al momento de dictarse la sentencia, en toda sentencia de dinero, a computarse sobre la cuantía de la sentencia que ordena el pago desde la fecha en que se dictó y hasta que ésta sea satisfecha, incluso las costas y los honorarios de abogado. El tipo de interés se hará constar en la sentencia.

La Junta fijará y revisará periódicamente la tasa de interés por sentencia, tomando en consideración el movimiento en el mercado y con el objetivo de desalentar la presentación de demandas frívolas, evitar la posposición irrazonable en el cumplimiento de las obligaciones existentes y estimular el pago de las sentencias en el menor tiempo posible.

(b) El tribunal también impondrá a la parte que haya procedido con temeridad el pago de interés al tipo que haya fijado la Junta en virtud del inciso (a) de esta regla y que esté en vigor al momento de dictarse la sentencia desde que haya surgido la causa de acción en todo caso de cobro de dinero y desde la presentación de la demanda, en caso de daños y perjuicios, y hasta la fecha en que se dicte sentencia a computarse sobre la cuantía de la sentencia, excepto cuando la parte demandada sea el Estado Libre Asociado de Puerto Rico, sus municipios, agencias, dependencias funcionarios o funcionarias en su carácter oficial. El tipo de interés se hará constar en la sentencia.

Así, la mencionada Regla establece dos (2) tipos de intereses legales: el interés postsentencia, que se refiere al tipo de interés que se impone a favor de la parte victoriosa en todas las sentencias que ordenen el pago de dinero. Éste se computa sobre la cuantía de la sentencia, incluyendo las costas y los honorarios de abogado, y se fija desde la fecha en que se dicte la sentencia hasta que ésta se satisface. *Gutiérrez v. A.A.A.*, 167 DPR 130, 136-137 (2006).

De otra parte, el interés por temeridad, el cual se impone cuando convergen los dos requisitos siguientes: que la parte haya

procedido temerariamente y que se trate de un caso sobre cobro de dinero o daños y perjuicios. *Lameiro v. Dávila,* 103 DPR 834, 841 (1975). Éste se fija sobre la suma principal de la sentencia dictada sin incluir las costas ni los honorarios de abogado. El interés por temeridad se calcula dependiendo de la reclamación de que se trate: en los casos de cobro de dinero, se computa desde que surge la causa de acción, y en el caso de daños y perjuicios se hará a partir de la presentación de la demanda. *Gutiérrez v. A.A.A.,* supra, pág. 137; *Montañez v. U.P.R.,* 156 DPR 395, 424-425 (2002).

C.

La figura de la sociedad legal de gananciales se identifica como una entidad separada y distinta de los cónyuges que la componen. *Cruz Viera v. Registrador,* 118 DPR 911, 914 (1987). El régimen de gananciales prevaleciente reconoce, como axioma básico, el patrimonio individual de cada cónyuge separado del de la sociedad. *Universal Funding Corp. v. Registrador,* 133 DPR 549, 554 (2004), citando a *García v. Montero Saldaña,* 107 DPR 319, 336 (1978).[2] En *Ex parte* García, 54 DPR 503, 507 (1939), el Tribunal Supremo de Puerto Rico expresó que:

> No existe ningún precepto legal que impida que una finca perteneciente en parte a uno de los cónyuges y en parte a la sociedad de gananciales se inscriba en el registro de la propiedad, expresando desde luego la parte proporcional correspondiente a cada una de las dos distintas entidades.

En estas circunstancias, no existe impedimento en que una persona adquiera una parte de una finca como bien privativo y otra parte como ganancial. *Mercado Riera v. Registrador,* 95 DPR 86, 95 (1967). Así, lo que surge es la figura de la comunidad ordinaria que habrá de regirse "por la normativa de la comunidad de bienes, concurriendo a la misma, de una parte, la pareja colectivamente y,

---

[2] El Código Civil de 1930 fue derogado por el Código Civil de 2020. Sin embargo, los hechos del caso de autos ocurrieron con anterioridad a la vigencia del nuevo Código, por lo que le aplica la jurisprudencia bajo el código de 1930.

de otra, el esposo o esposos titulares individuales". *Universal Funding Corp. v. Registrador,* supra, citando a *Rovira Tomás v. Srio. de Hacienda,* 88 DPR 173, 176 (1963).[3]

### III

En primer orden, atenderemos el señalamiento de error traído por el apelante sobre la imposición de intereses presentencia. Según expuesto, el interés presentencia surge cuando el Tribunal de Primera Instancia determina que una parte incurrió en temeridad, conforme se desprende de la Regla 44.3 (b) de Procedimiento Civil, *supra.* En el caso de autos, el foro *a quo* impuso intereses al tipo legal del 8% anual, acumulados dese el 1 de febrero de 2018, fecha en que la apelada exigió el pago de renta del inmueble en controversia. De la transcripción de la prueba oral y de la Sentencia se desprende que ninguna parte incurrió en temeridad. Cuando una parte exige el canon de renta, esta tiene que presentar evidencia que justifique la suma, y del expediente surge que la apelada no aportó evidencia alguna del canon de renta. Ante ello, entendemos que abusó de su discreción el foro *a quo,* toda vez que no procede imponer el pago del interés legal a una renta que además no se sabe su cuantía. Lo que correspondía era imponer el interés legal *postsentencia,* el cual es parte integral de las sentencias dictadas y pueden cobrarse aun cuando nada se haya dispuesto en una sentencia. *Quiñones López v. Manzano Pozas,* 141 DPR 139, 181 (1996).

En su segundo señalamiento de error, el apelante imputó error al foro primario al decretar que le pertenece un 37.5% del inmueble a la Sociedad Legal de Bienes Gananciales. No le asiste la razón. De los hechos se desprende que el bien inmueble objeto de esta reclamación le fue dejado en herencia en un 45.83%, un

---

[3] Véase, además, *Comentarios a las reformas del derecho de familia,* Madrid, Ed. Tecnos, 1984, Vol. II, pág. 1,629.

16.67% donación, por lo que el restante 37.5% tuvo que adquirirlo mediante compraventa. El dinero para comprar ese porciento fue adquirido mediante un préstamo, en el cual se obligaron ambos cónyuges, haciendo este uno ganancial. Según expuesto, el TPI calculó el valor de la participación de la apelada en la comunidad en $33,218.75 y dispuso que la titularidad del inmueble se le adjudicaría al apelante. En síntesis, a tenor con el derecho discutido y a base de los hechos del caso bajo examen, es claro que procede otorgar ese valor a la apelada por su participación en la Sociedad Legal de Bienes Gananciales.

En su tercer señalamiento de error, el apelante imputó error al foro primario al este descartar el testimonio del perito para asignar un porciento hipotético para otorgar un valor monetario del bien inmueble privativo y dejar de atribuir los créditos correspondientes a la apelada. Tampoco le asiste la razón. Examinada la transcripción de la prueba oral, surge claramente que el TPI no descartó el testimonio del perito estimador de costos de construcción.[4] Lo que no se admitió en evidencia fue el informe de estimado de costos de construcción preparado por el perito Cintrón. Se desprende de la transcripción de la prueba oral que la juzgadora de los hechos apoyó su decisión en que las bases fácticas en las que el perito descansó su opinión no estaban en evidencia y por las razones que expresó el apelante, entiéndase en que el informe del perito era uno incompleto, carecía de los "ítems" que el perito no recogió en su informe y que los costos incluidos en este documento eran unos estimados entre el 1997 al 2017 sin especificar en qué año se construyó cada cosa en el inmueble.[5]

---

[4] "Con la anuencia de la parte demandada, se le califica como perito en temas de la estimación de la construcción." Véase Transcripción de la Prueba Oral (TPO) pág. 311.

[5] Véase TPO págs. 345-346 y 348.

IV

Por los fundamentos que preceden, se modifica la *Sentencia* apelada, a los únicos efectos de eliminar la disposición de los intereses legales del 8% anual, acumulados desde el 1 de febrero de 2018 y hasta que se satisfaga la Sentencia. En consecuencia, procede imponer los intereses *postsentencia* correspondientes.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

La juez Barresi Ramos concurre con el resultado sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones